IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | * | Case No. PX 16-125 |
| | * | |
| JUSTIN LARSON, | * | |
| Defendant. | * | |

\*\*\*\*\*\*

## MEMORANDUM OPINION

Pending before the Court is Defendant Justin Larson's motion to suppress the fruits of a warrantless search conducted on a package shipped from China and destined for Gaithersburg, Maryland.  ECF No. 12.[1]  The Government contends that the warrantless search was justified as under the extended border search doctrine.  For the following reasons, the Court agrees and will deny Defendant's motion.

## A.    PROCEDURAL HISTORY

On March 28, 2016, Larson was charged with one count of distribution of a controlled substance analogue with death resulting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and one count of conspiracy to distribute a controlled substance analogue in violation of 21 U.S.C. § 846. On August 3, 2016, the Government filed a superseding indictment, adding four counts of possession of a controlled substance analogue with intent to distribute, one count of possession

---

[1] In his supplemental motion to suppress, Larson also challenged three residential searches located in Rockville, Maryland and Gaithersburg, Maryland; the search of his cell phone on September 5, 2015; and a statement given to law enforcement on March 17, 2016. At the December 12, 2016 hearing, the Court denied Defendant's motion with respect to each of these evidentiary challenges.  The only remaining suppression issue concerns the warrantless search of a parcel and resulting search of the residence located at Brassie Place, Gaithersburg, Maryland.

of a controlled substance with intent to distribute, and one count of attempted possession of a controlled substance analogue with intent to distribute. ECF No. 16.

Larson then filed a motion and supplemental motion to suppress evidence and statements. ECF Nos. 6, 12.  In his motion, Larson challenged, *inter alia*, the constitutionality of a warrantless search and seizure of a package that had been transported from China and destined for a Gaithersburg, Maryland address. On December 12, 2016, the Court held a suppression hearing where the Government contended that the warrantless seizure and search of the package was justified as an extended border search.  After hearing from two witnesses called by the Government—Special Agent Jason Shatarsky from the United States Department of Homeland Security (DHS) and Corey Evans, the Operations Manager of TNT, a private commercial carrier—and oral argument, the Court requested supplemental briefing from the parties. ECF No. 35.  On December 14, 2016, the Court received supplemental letter pleadings from the Government and Defendant.  ECF Nos. 38, 41.[2]

## B.    OPERATIVE FACTS

At the suppression hearing, the following undisputed facts were established.  On February 10, 2015, the parcel in question began its journey from China to the United States. Its ultimate destination was to be 19413 Brassie Place, Gaithersburg, Maryland. TNT, an international parcel delivery service akin to FedEx Express, was responsible for shipping the package. TNT took custody of the package in China and airmailed it to the United States. The

---

[2] In this pleading and for the first time, the Government alternatively argues that Larson lacks standing to challenge the search of this package.  Importantly, the Government never raised this argument in any prior pleadings or at oral argument, thus depriving Larson of any meaningful response.  Accordingly, the Government waived its right to challenge standing. *See Steagald v. United States*, 451 U.S. 204, 209 (1981); *United States v. Owens*, No. CRIM. HAR 86-0370, 1986 WL 13127, at *4 n.5 (D. Md. Nov. 18, 1986), *aff'd*, 848 F.2d 462 (4th Cir. 1988); *United States v. Foster*, 763 F. Supp. 2d 1086, 1090 (D. Minn. 2011) ("By failing to argue in a timely manner that Foster lacked a reasonable expectation of privacy in the car in which the gun was found, the government has waived its right to make that argument.")

package entered the United States at John F. Kennedy Airport (JFK) in New York.  As is routine with all TNT packages delivered from China to the United States, TNT maintains constant custody and control over the packages from the moment TNT takes possession until the package is delivered to its final destination.  Specifically, when the packages arrive at JFK, TNT loads them into a secure warehouse where they are then loaded into a secure TNT truck and transported to a TNT distribution hub in geographic proximity to its final consumer destination.  During transport, the packages are locked securely in a truck and not accessible to anyone including the driver. Once the packages reach the TNT hub in Bowie, Maryland, they are then sorted and delivered to their final destinations.

TNT from time to time works cooperatively with federal law enforcement to hold and search packages deemed suspicious. Because such cooperation often delays the delivery of the packages, TNT will also, at law enforcement's request, manipulate the package tracking information publicly available to its customer base to hide the real reason for the delay. TNT further will provide space in its facility for law enforcement to search packages.

This is precisely what happened here. Special Agent Shatarsky testified that while the package in question was in transit, DHS learned of four other similarly sized and weighted packages which were shipped from China via TNT through JFK, all of which contained illegal narcotics.  Specifically, on February 9 and 10, 2015, Agent Shatarsky was involved in the seizure and search of two such TNT packages which contained methamphetamine.  Agent Shatarsky testified to seizing and searching the first two packages on February 9.  Agent Shatarsky then participated in a controlled delivery involving the second two packages and received consent to search those two additional packages on February 10.

Each of the searches uncovered illegal narcotics packaged the same way: a mylar plastic bag held the drugs; the bag was then secreted in a small water cooler; the box holding the water cooler appeared to be the commercial packaging for the water cooler.  Of the four prior deliveries, two originated from a Shanghai address that was nearly identical for all practical purposes to originating address for the package in question. *See* Gov't Ex. 1-5.

As a result, when the package in this case came to Agent Shatarsky's attention, he contacted TNT operations manager Corey Evans to intercept it.  Agent Shatarsky specifically requested that Mr. Evans hold the package and make it appear in the TNT website that delivery was delayed for a period of time sufficient to allow the Agents to search the package. When the package arrived at the Bowie, Maryland location, it was placed in a secure cage where it remained until February 17, 2015.  At that time, Agents Shatarsky and another fellow agent arrived at the TNT Bowie facility.  Evans provided the agents a designated area to search the package.

Agents observed that the parcel was consistent in size, shape and weight to the prior four shipments.  Based on those similarities and in combination with the similarity of sender address to the prior two packages, Agent Shatarsky opened the package. Inside he found a water cooler almost identical in appearance to the ones used in the prior four shipments. This cooler was packaged similarly to the prior four, and contained within the water cooler was a mylar bag of similar size and color.  The bag contained what appeared to be controlled substances.  Agent Shatarsky then contacted fellow agents to retrieve the package.

The substance in the package ultimately tested positive for acetyl fentanyl.  A controlled delivery was made to its final destination, 19413 Brassie Place, Gaithersburg, Maryland.  Amber Sullivan, Larson's girlfriend, signed a fake name and accepted the package.  Agents then took

Sullivan and another individual into custody. After being read her *Miranda* rights, Sullivan told

the agents that Larson asked her to pick up the package.  During Sullivan's detention with the

agents, Larson called Sullivan's cell phone to confirm the package had been delivered.

## C.    ANALYSIS

The Government contends that the search was permissible under the extended border

search doctrine.  The Court agrees.

Warrantless searches made at the United States' border are permissible and reasonable

"simply by virtue of the fact that they occur at the border." *United States v. Saboonchi*, 990 F.

Supp. 2d 536, 545 (D. Md. 2014) (internal citation and quotations omitted). This is so because

the sovereign maintains a "long-standing right to protect itself by stopping and examining

persons and property crossing into this country." *Id.* (quoting *United States v. Ramsey*, 431 U.S.

606, 616 (1977).

Where a package that has crossed into the United States is searched thereafter and

enroute to its final destination, the warrantless search is constitutionally permissible if, "(1)

under the totality of the circumstances it is reasonably certain that the contraband subject to

search crossed the border and (2) the search is supported by reasonable suspicion." *United States

v. Wall*, 378 Fed. App'x. 639, 640 (9th Cir. 2010).  *See also United States v. Shanaja*, 430 F.3d

1049, 1054 (9th Cir. 2005).  Importantly, the circumstances must convince the finder of fact with

reasonable certainty that any contraband which may be found in the item to be searched was in

the same condition as when it left its original overseas destination. *See United States v. Richards*,

638 F.2d 765, 772 (5th Cir. 1981) ("the Government must also be able to show, with reasonable

certainty, that conditions remained unchanged from the time of the border crossing until the

subsequent warrantless search."). *See also United States v. Cardona*, 769 F.2d 625, 629 (9th Cir.

1985) ("When the parcel was placed in the custody of Federal Express agents, it was all but certain that the parcel's condition would remain unchanged until it crossed the United States border.").

Here, the totality of the circumstances justifies application of the extended border search exception. The uncontroverted evidence demonstrates that TNT took custody of the package in China and maintained exclusive control over the package until it reached its TNT Maryland hub in Bowie. Specifically, Mr. Evans testified that once the package cleared customs at JFK, it was placed in a secured warehouse and then transported in locked cab of a truck equipped with a security seal. This ensures that no one (not even the driver) can surreptitiously access the packages until they reach the Bowie warehouse. On arrival, Evans personally placed the package in a locked cage until Agent Shatarsky arrived to seize and search it. In sum, at the point of Shatarsky's seizure, the package was in the same condition as when it left China.

Secondly, reasonable suspicion existed to believe that package contained illegal narcotics. In the few days prior to the package's arrival at JFK, agents had seized four other packages also from China to the DC/Maryland area via JFK as the point of entry. Each of those four contained illegal narcotics secreted in small water coolers of identical size and shape. Two of the parcels originated from the same sender address as the parcel in question. It was, therefore, reasonable for Agent Shatarsky to search this parcel of similar size, weight and packaging which had originated from the same sender as two other packages containing contraband discovered a few days before.

That nearly seven days elapsed between TNT first taking control of the package and the search gave the Court some pause. This combined with the fact that the package traveled over 100 miles from the border led the Court to question the propriety of an extended "border" search

so far from the package crossing the border in time and distance. But as the Government rightly points out, where the integrity of the package has been maintained during its journey, it is difficult to see how the time and distance at play here would be "a factor of constitutional significance." *Shanaja*, 430 F.3d at 155 (nine days between parcel entering United States and warrantless search).  *See also Wall*, 378 F. App'x at 641 ("Wall's DHL package was in the custody of customs officials of DHL agents at all times, and it is evident that the contents were undisturbed between the time the package physically entered Guam and the time it was searched."); *Richards*, 638 F.2d at 767–68 (upholding extended border search where parcel entered border at New York but was not searched until reaching its final geographic destination of Miami nearly two weeks later).

**D.    CONCLUSION**

 Accordingly, because the Government has met its burden of showing that the extended border search doctrine applies here and that the search, under the totality of the circumstances was supported by reasonable suspicion that the package contained contraband, Larson's motion to suppress its contents is denied.

 12/19/2016              /S/
Date                   Paula Xinis
                    United States District Judge